IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-2610
_____


JEFFREY DEAN MOTLEY,

                    Petitioner-Appellant,

v.

JAMES A. COLLINS, Director,
Texas Department of Criminal Justice,
Institutional Division,

                    Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
(April 1, 1994)


Before KING, DAVIS and WIENER, Circuit Judges.

KING, Circuit Judge:

    The opinion and dissenting opinion in this case filed on

September 21, 1993, and reprinted at 3 F.3d 781 (5th Cir. 1993),

are withdrawn, and the following opinion is substituted therefor.

    Jeffrey Dean Motley, a Texas death row inmate convicted of

capital murder, appeals from the district court's decision

denying his petition for a writ of habeas corpus.  For the

reasons discussed below, we affirm the district court's decision

denying the writ.

## I.  BACKGROUND

On the morning of July 22, 1984, Maria Duran left her home to drive to a friend's apartment to go swimming.  She never arrived.  Duran's family called the police, who began investigating her disappearance.

Seven days later, on July 29, 1984, the police arrested Jeffrey Motley as he was driving Duran's car.  A search of the car uncovered a sawed-off shotgun, a number of shotgun shells, and a hunting knife.  Police also discovered traces of human blood on the spare tire in the trunk of Duran's car and on one of the tennis shoes that Motley was wearing.  Duran's credit cards, driver's license, and social security card were found in a trash bin near the apartment complex where Motley was arrested.

On August 1, 1984, three days after Motley's arrest, police found Duran's body in a field.  There were some signs that Duran had been sexually assaulted,[1] but the evidence was ultimately found to be inconclusive.  The cause of death, according to the medical examiner, was a gunshot wound in the back.  Investigators could not determine, however, whether the shotgun slug that killed Duran was fired from the shotgun found in Duran's car.

Based on the evidence found in Duran's car at the time Motley was arrested, as well as other circumstantial evidence linking Motley to the crime, the jury convicted Motley of capital murder.  After hearing evidence on issues relevant to sentencing,

---

[1] Specifically, there was evidence that Duran's shorts had been removed and that her swimsuit had been cut away at the crotch.

including evidence that Motley was physically and sexually abused as a child, the jury was presented with two of the three Texas special issues:

(1)   Was the conduct of the Defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased would result?

(2)   Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

See TEX. CODE CRIM. PROC. ANN. art. 37.071(b) (Vernon 1989). The jury answered both of these questions affirmatively and, as a result, Motley was automatically sentenced to death.

Motley's conviction and sentence were affirmed on direct appeal. See Motley v. State, 773 S.W.2d 283 (Tex. Crim. App. 1989). The Texas Court of Criminal Appeals denied rehearing on May 24, 1989. Because Motley did not petition the Supreme Court for writ of certiorari, his conviction became final ninety days later--about two months after the Supreme Court issued its opinion in Penry v. Lynaugh, 492 U.S. 302 (1989). Thereafter, Motley filed a petition for habeas corpus in state court, which was denied on July 22, 1992. See Ex Parte Motley, No. 23806 (Tex. Crim. App. 1992). Motley then proceeded to federal district court, where the judge denied habeas relief on all of his claims. This appeal followed.

## II.   INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

In district court, Motley argued that his trial counsel rendered ineffective assistance of counsel by committing errors

3

at various stages of his capital murder trial.  Among other things, Motley argued that his counsel rendered ineffective assistance by:  (a) agreeing with the State, during voir dire, that the term "deliberately" under the first special issue means essentially the same thing as "intentionally" in the guilt/innocence phase of the trial; (b) calling Motley as a witness after the State rested with evidence that, according to Motley, was insufficient to support a conviction; (c) being generally unfamiliar with capital sentencing law--particularly, the admissibility of unadjudicated extraneous offenses; and (d) failing to investigate and introduce evidence of Motley's brain damage during the punishment phase of the trial.

The district court rejected Motley's ineffective assistance of counsel claim.  It first reasoned, "The state court found that Motley received effective assistance at all phases of his trial. Because the record supports those factual findings, they are presumed correct."  The district court further reasoned, with respect to each of the alleged errors, that they either represented valid strategic choices by Motley's trial counsel or did not prejudice his defense.

As explained below, the district court correctly rejected Motley's ineffective assistance of counsel claim.  Although we disagree with the district court's assertion that the state court's finding of effective assistance is entitled to a presumption of correctness as a factual finding under 28 U.S.C. § 2254(d), we agree that on this record Motley has failed to show

4

how the alleged errors prejudiced the outcome of either the guilt/innocence or punishment phase of his trial.

## A. *The Strickland Framework*

The standard for assessing whether counsel rendered constitutionally ineffective assistance, which was set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), is a familiar one. To obtain relief, a criminal defendant must first demonstrate that counsel's performance was deficient. The defendant must also demonstrate that counsel's deficient performance prejudiced the defense. Id. at 687; United States v. Smith, 915 F.2d 959, 963 (5th Cir. 1990).

The proper standard for measuring counsel's performance under the first prong of Strickland is reasonably effective assistance. That is, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. Our scrutiny of counsel's performance must be "highly deferential," and we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Under Strickland, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

To satisfy the prejudice prong of Strickland, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

5

would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.  The defendant need not show that "counsel's deficient conduct more likely than not altered the outcome in the case."  Id. at 693.  But it is not enough, under Strickland, "that the errors had some conceivable effect on the outcome of the proceeding."  Id.

In reviewing ineffective assistance claims raised on habeas corpus, we do not, contrary to the district court's assertion otherwise, defer to a state court's conclusion that counsel rendered constitutionally effective assistance.  As Justice O'Connor has stated:

> Ineffectiveness is not a question of "basic, primary, or historical fac[t]," Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963).  Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact.

466 U.S. at 698.  And, "[a]lthough state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact."  Id.[2]

_____

[2] We note that this is not the first time this district court judge has erroneously suggested that a state court's finding of effective assistance is entitled to deference as a factual finding under § 2254(d).  See, e.g., Black v. Collins, 962 F.2d 394, 401 (5th Cir.) ("Contrary to what the federal district court appears to have thought, a state court's ultimate conclusion that counsel rendered effective assistance is not a fact finding to which a federal court must grant a presumption of correctness under 28 U.S.C. § 2254(d)."), cert. denied, 112 S. Ct. 2938 (1992).

6

Finally, in deciding ineffectiveness claims, we need not address both prongs of the Strickland test. If we can "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Id. at 697. We therefore proceed in such a fashion.

B. *Assessing Motley's Claim Under the Strickland Framework*

The alleged errors to which Motley points are not sufficient, either alone or in combination, to render his trial counsel's performance constitutionally ineffective. While Motley's trial counsel may have been deficient in certain respects, this deficient performance did not, in our view, prejudice the outcome of either the guilt/innocence or the sentencing phase of Motley's trial. We therefore affirm the district court's decision to the extent that it denied relief on this ground.

First, Motley complains about his trial counsel's failure to correct the State's assertion during voir dire that the term "deliberately," as used in the first Texas special issue, was substantially equivalent in meaning to the term "intentionally." Motley correctly points out that the Texas Court of Criminal Appeals has refused to equate the two terms. See Motley v. State, 773 S.W.2d at 289 ("We have decided that `deliberately,' as used in the first special issue is not the linguistic equivalent of `intentionally,' as used in the charge on guilt-innocence."); Heckert v. State, 612 S.W.2d 549, 553 (Tex. Crim. App. 1981) (presuming that Texas legislature did not intend "for

7

finding of deliberateness to be based upon the same standard as that of intentional or knowing").  But this observation establishes, at most, that Motley's trial counsel was deficient. Motley has not satisfactorily demonstrated a reasonable probability that, had his trial counsel corrected any misapprehension on the part of jurors during voir dire, the result of the sentencing proceeding would have been different. Specifically, he has not shown how a more favorable definition of "deliberately" would have caused at least one juror[3] to return a negative answer to the first special issue.  See Landry v. Lynaugh, 844 F.2d 1117, 1120 (5th Cir.), cert. denied, 488 U.S. at 900 (1988).

Motley also argues that his trial counsel, instead of calling him to the stand, should have rested after the State put on its case in chief.  He contends that, if he had not been called to testify, and if the State had not impeached him with a statement in which he admitted killing Duran, there would have been insufficient evidence upon which to convict him.  We disagree.  Motley has not demonstrated a reasonable probability that, if he had not testified, (1) the jury would not have convicted him of capital murder, or (2) his conviction would have been reversed on the basis of insufficient evidence.  In short,

---

[3] Under the Texas capital sentencing scheme in existence at the time of Motley's trial, if jurors became deadlocked on any of the special issues--i.e., they could not get twelve "yes" votes or ten "no" votes--the court was required to sentence the defendant to life imprisonment.  See TEX. CODE CRIM. PROC. ANN. art. 37.071(e) (Vernon Supp. 1990) (subsection (e) amended in 1981).

8

we find that the State introduced ample evidence during its case in chief to support a guilty verdict.  Thus, Motley fails to satisfy <u>Strickland</u>'s prejudice requirement.

Motley has also failed to demonstrate prejudice resulting from his trial counsel's alleged unfamiliarity with capital sentencing law.  Motley complains specifically that his trial counsel "did not understand the admissibility of unadjudicated offenses at the punishment stage of a capital murder trial."  Yet he concedes that the Texas Court of Criminal Appeals has "long held" that unadjudicated offenses are admissible at the punishment phase of a capital murder trial.  <u>See</u> <u>Kinnamon v. State</u>, 791 S.W.2d 84, 93 (Tex. Crim. App. 1990) (citing numerous cases).  Although the Supreme Court has not considered the question,[4] we have also sanctioned the practice of admitting unadjudicated offenses during the punishment phase of trial.  <u>See</u> <u>Landry v. Lynaugh</u>, 844 F.2d at 1121 (rejecting, albeit with reservations, a due process challenge to the practice); <u>Williams v. Lynaugh</u>, 814 F.2d 205, 208 (5th Cir.) (rejecting an equal protection challenge to practice), <u>cert. denied</u>, 484 U.S. 935 (1987).  Motley has thus not alleged how his trial counsel's unfamiliarity with the law on unadjudicated extraneous offenses

---

[4] <u>See</u> <u>Williams v. Lynaugh</u>, 484 U.S. 935 (1987) (Marshall, J., joined by Brennan, J., dissenting from denial of certiorari) (arguing that practice of admitting unadjudicated extraneous offenses at capital sentencing proceeding "presents a serious constitutional issue"); <u>see</u> <u>also</u> Steven Paul Smith, Note, <u>Unreliable and Prejudicial:  The Use of Extraneous Unadjudicated Offenses in the Penalty Phases of Capital Trials</u>, 93 COL. L. REV. 1249 (1993) (criticizing the practice as injecting unreliability into the sentencing process).

resulted in the admission of any evidence that should have, or would have, been excluded.

Finally, Motley complains about his trial counsel's failure to develop mitigating evidence concerning his organic brain damage. Had Motley's trial counsel not pursued a strategy of introducing evidence of Motley's child abuse, we might well agree that the failure to introduce evidence of his brain damage would have been a reasonable strategic decision; after all, such evidence may have been "double-edged"--in that it may have militated in favor of a "yes" answer to the future dangerousness special issue. Given the strategic choice of Motley's trial counsel to present evidence of physical and sexual abuse, see Motley v. State, 773 S.W.2d at 290, however, it may have been unreasonable for him to ignore evidence of neurological damage and other evidence that would have been in the same vein as the evidence actually introduced at the punishment phase.

In any event, Motley has not satisfied the prejudice prong of Strickland. Much of the non-record Penry evidence merely corroborated the substantial trial testimony that Motley was abused as a child, and thus would have been cumulative of the evidence actually introduced. More important, the evidence of organic brain damage was relatively weak: a doctor who examined Motley as a child concluded that he had "neurological soft signs" and diagnosed him as having "neurological organic involvement." In short, we find no reasonable probability that this additional mitigating evidence would have tipped the scales in favor of a

10

life sentence.  See Duhamel v. Collins, 955 F.2d 962, 966 (5th Cir. 1992).


### III.  PENRY CLAIM

Motley also raised a Penry claim in district court.  He argued that the Eighth Amendment requires that whenever a defendant in a capital case proffers mitigating evidence that has some arguable relevance beyond the Texas special issues, the defendant is entitled, in effect, to an additional "special issue" asking whether any mitigating evidence so proffered, whether or not relevant to the existing special issues, leads the jury to believe that the death penalty should not be imposed. Because Motley was not given an additional "special issue" posing that inquiry or an instruction that did service for such an issue, he claimed that he was entitled to habeas relief.  The district court summarily rejected Motley's Penry claim.  It concluded that, because Motley failed to object to the special issues on Penry grounds, he procedurally defaulted his claim. The district court alternatively reached the merits of Motley's Penry claim, but only to hold that it was frivolous:

> Motley's argument is simple and wrong.  [He argues that] [h]is circumstances were pitiful as a child; therefore, he is not responsible for his acts.  Freedom necessarily implies responsibility; Motley abused his freedom.  He must bear the consequences the state of Texas has prescribed for this particular abuse, after he has been afforded every protection the procedures of a humane, reasonable people can offer.
> Child abuse is tragic for anyone, but its ability to break the causal connection between the free will of the defendant and the fate of his victim has never been suggested.  If a defendant could argue that this

11

experience as a youthful victim of abuse led him to react excessively to his perception of a threat, he could lend some support to an otherwise implausible assertion of self defense. These sorts of considerations were not present in this case.

Motley argues that his experience as a victim of abuse in part justified his murdering an innocent passer-by . . . ; this is not a constitutional issue. Motley's position is an insult to people everywhere who have overcome their injuries and deprivations to become successful contributing members of our community. Also, murders are committed by people who were not abused, contradicting the causal inference Motley wants the court to make.

Our assessment of Motley's Penry claim proceeds in parts. We necessarily begin by addressing whether Motley had properly preserved his Penry claim for habeas review. We then discuss whether Motley is entitled to federal habeas relief on his Penry claim.

A.  *Was Motley's Penry Claim Properly Preserved?*

We note initially that a Penry claim can be considered on collateral review only if the petitioner actually proffered the mitigating evidence he contends was beyond the reach of jurors at his capital trial. See Barnard v. Collins, 958 F.2d 634, 637 (5th Cir. 1992), cert. denied, 113 S. Ct. 990 (1993); May v. Collins, 904 F.2d 228, 232 (5th Cir. 1990), cert. denied, 111 S. Ct. 770 (1991); DeLuna v. Lynaugh, 890 F.2d 720, 722 (5th Cir. 1989); Ex Parte Goodman, 816 S.W.2d 383, 386 n.6 (Tex. Crim. App. 1991). However, at least in a case such as this, which was tried before Penry was decided, the petitioner need not have requested an instruction on mitigating evidence, nor must he have objected to the lack of such an instruction. See Selvage v. Collins, 816

12

S.W.2d 390, 392 (Tex. Crim. App. 1991) (on certified question from the Fifth Circuit Court of Appeals).

At the punishment phase of trial, Motley testified that his father began physically abusing him when he was about four or five years old. Motley recounted one instance when his father beat him until he was "bloody, all over." On this occasion, Motley recalled, his father "had to put me in a tub of ice to stop the bleeding." Motley also stated that his father used his head as a battering ram and, on more than one occasion, slammed his head between doors. Other instruments of abuse included: "belt buckles in the face" and a boxed-in wrench, which his father used to hit Motley "everywhere he could hit."

According to Motley, the abuse by his father did not stop at beatings; it also included sexual and psychological abuse. Indeed, Motley testified that his father had anal and oral sex with him until he was about thirteen. Although Motley could not recall the number of times his father sexually abused him, he stated that the sexual abuse stopped after his mother threatened to divorce his father. Motley also recounted an incident in which he was punished for not cleaning out his gerbil cage. He stated that his father took his gerbils out and "squashed them" to death in front of him.

Nor was Motley's father the only abuser. His mother often failed to protect him and, on at least one occasion, physically assaulted him herself. Motley specifically recalled an instance where his mother came up behind him with a pool stick and

13

"whacked" him in the back of the head.  When he turned around, Motley further recalled, he "got whacked in the mouth."  At the punishment phase of trial, Motley pointed to the F-shaped scar on his face which, he contended, was the result of being hit with a pool stick.

Motley's stories of abuse were corroborated by his neighbors, the Howells, who had known Motley since he was three. Margaret Howell recalled that, when Motley was about eight, he spent the night out on a busy highway; she knew this because her son picked Motley up the next morning and brought him to her home.  She also remembered Motley being locked out of his home "on one of the bitterest [winter] nights."  On one winter day, she continued, she saw Motley being hosed down with cold water by his father in the yard.  She further testified that, on numerous occasions, Motley came to her house bruised and bleeding, and that she gave him food and shelter.  Mrs. Howell concluded, "He has had a hell of a life."  Mrs. Howell's husband, Douglas, also recalled seeing evidence that Motley was being abused.  He stated that, although he never actually witnessed any abuse, on several occasions he noticed blood or bruises on Motley's face and skull. He further remembered seeing bars and padlocks on Motley's bedroom window.

Finally, the defense called Dr. Fred Fason, a psychiatrist with extensive experience in treating child abuse victims, who testified about the likely effects of such abuse.  He stated that, in his experience, victims of child abuse, "even at the age

14

of eight or ten or twelve, were the kids that were most prone to pick a fight or beat up a younger child, or throw rocks at other kids and engage in behavior that we considered to be anti-social behavior, particularly in relationships to smaller children."  He further explained the phenomenon of a child abuse victim's "identification with the aggressor":

> The reason so many parents abuse the children who were abused is what psychoanalysts call identification with the aggressor.  In their head, there is the play of the scene of the powerful person who is out to harm the smaller person.  It is much better for them to be that powerful person, doing the harm, than the smaller person who is being terrorized.  So, this is kind of what, in answer to your question, the effect on the child who is abused as a child, is to terrorize and at the same time to give him the feeling that no one really cares.  And . . . that combination leads him then to identify with the powerful figure, the way he conceptualizes the abusing parent, and then acts that out with other people in his life.  This is why abused children so frequently get into difficulties with the law or difficulties with their own children, when they become parents.

When sexual abuse is combined with physical abuse, Dr. Fason continued, it becomes "particularly difficult" for the child to cope:  "[Y]ou have total separation of sexual feelings from soft and tender feelings to where [the child] becomes incapable of loving in a normal way."

Our review of the record thus reveals substantial evidence that Motley was abused as a child.  Indeed, the Texas Court of Criminal Appeals noted that "[a]ll of the evidence . . . presented at the punishment stage of the trial went to the proposition that [Motley] had been abused both physically and sexually as a child and as a result of that abuse, he acted out."

15

*Motley v. State*, 773 S.W.2d at 290.  Motley therefore properly preserved his *Penry* claim for collateral review.  The district court erred in holding that Motley, by failing to object to the charge or request an additional instruction, procedurally defaulted his *Penry* claim.

B.  *Is Motley Entitled to Federal Habeas Relief?*

Because Motley raises his *Penry* claim in a petition for a writ of federal habeas corpus, "'we must determine, as a threshold matter, whether granting him the relief he seeks would create a "new rule" of constitutional law'" under *Teague v. Lane*, 489 U.S. 288 (1989) (per curiam), and its progeny.  *Graham v. Collins*, 113 S. Ct. 892, 897 (1993) (quoting *Penry*, 492 U.S. at 313).  Under *Teague*, a "new rule" is one which "'imposes a new obligation on the States or the Federal Government'" or was not "'dictated by precedent existing at the time the defendant's conviction became final.'"  *Id.* (quoting *Teague*, 489 U.S. at 301).  As the Supreme Court aptly noted, it is extremely difficult "'to determine whether we announce a new rule when a decision extends the reasoning of . . . prior cases.'"  *Id.* (quoting *Saffle v. Parks*, 494 U.S. 484, 488 (1990)).  Nonetheless, we are instructed that "unless reasonable jurists hearing [Motley's] claim <u>at the time his conviction became final</u> 'would have felt compelled by existing precedent' to rule in his favor, we are barred from doing so now."  *Id.* (quoting *Saffle*, 494 U.S. at 488) (emphasis added).

16

Because Motley did not petition the Supreme Court for writ of certiorari, Motley's conviction and sentence became final ninety days after the Texas Court of Criminal Appeals denied a rehearing on its decision to affirm Motley's conviction and sentence on direct appeal--about two months after the Supreme Court decided Penry. We must thus ascertain the scope of Penry to determine whether the ruling Motley now seeks fits within Penry's ambit or instead would create a "new rule" of constitutional law under Teague.

### 1. The Supreme Court's Decision in Penry

In Penry v. Lynaugh, the Supreme Court reaffirmed the Eighth Amendment principle that "punishment should be directly related to the personal culpability of the criminal defendant." 492 U.S. at 319. This culpability principle, which was first articulated by a plurality of the Court in Lockett v. Ohio, 438 U.S. 586 (1978), and later embraced by a majority in Eddings v. Oklahoma, 455 U.S. 104 (1982), places special constraints on states in meting out the death penalty. Under the Lockett-Eddings "rule," a state cannot, consistent with the Eighth and Fourteenth Amendments, preclude the sentencer from considering as a mitigating factor evidence relevant to the defendant's background or character "that the defendant proffers as a basis for a sentence less than death." Penry, 492 U.S. at 317.

The evidence Penry had proffered was that of his mental retardation and child abuse which left him unable to learn from his mistakes. Id. at 308. The Penry Court concluded that absent

17

instructions informing the jury that it could consider and give effect to Penry's evidence, the Texas special issues did not provide the jury with a vehicle for "expressing its 'reasoned moral response' to [Penry's] evidence in rendering its sentencing decision." Id. at 328. Before reaching this conclusion, however, the Court had to determine whether the rule Penry sought in his federal habeas petition was a "new rule" under Teague. Id. at 313. The Court found that Penry was simply asking that in his particular case, the jury should have, upon request, "been given jury instructions that ma[d]e it possible for them to give effect to [his] mitigating evidence in determining whether the death penalty should be imposed." Id. at 319. Accordingly, the Court determined that the relief Penry sought was "dictated" by the Court's previous decisions in Lockett and Eddings and was thus not a "new rule" under Teague.

Moreover, the Court determined that the relief Penry sought did not impose a "new obligation" on the State of Texas. Id. The Court made this determination by first pointing out that the facial validity of the Texas death penalty statute under which Penry had been sentenced had been upheld in Jurek v. Texas, 428 262 (1976). Id. at 318. After explaining that the statute's validity had been upheld "on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present," the Court characterized Penry's request for relief as being premised on the fact that

18

"those assurances had not been fulfilled in [Penry's] particular case." Id.

In addressing the merits of Penry's claim, the Court initially focused on the first special issue, which asked whether the defendant killed "deliberately and with the reasonable expectation that the death of the deceased . . . would result." The Court reasoned:

> In the absence of jury instructions defining "deliberately" in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue. Without such a special instruction, a juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime "deliberately." Thus, we cannot be sure that the jury's answer to the first special issue reflected a "reasoned moral response" to Penry's mitigating evidence.

Id. at 323.

The Court similarly held that Penry's evidence of mental retardation and child abuse was relevant beyond the scope of the second special issue, which asks "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The Court specifically focused on the fact that Penry's mitigating evidence of mental retardation and child abuse showed "his inability to learn from his mistakes." Id. at 323 (emphasis added). The Court thus determined that although the mitigating evidence offered by Penry was relevant to the second special issue, it was

19

relevant <u>only</u> as an aggravating factor "because it suggests a 'yes' answer to the question of future dangerousness." <u>Id.</u>

Finally, the Court held that the third special issue, which asks "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased," was an insufficient vehicle for giving mitigating effect to Penry's evidence of mental retardation and child abuse.[5] The Court therefore decided that in Penry's particular case, the jury should have been instructed "that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty . . . ."[6]

_____

[5] The Court noted that the evidence presented at trial suggested that Penry "did not stab the victim after she wounded him superficially with a [pair of] scissors during a struggle, but rather killed her after her struggle had ended and she was lying helpless." <u>Penry</u>, 492 U.S. at 324. And, it concluded that "a juror who believed Penry lacked the moral culpability to be sentenced to death could not express that view in answering the third special issue if she also concluded that Penry's action was not a reasonable response to provocation." <u>Id.</u> at 324-25.

[6] Motley argues, as did Penry, that the three Texas special issues did not provide an adequate vehicle to give effect to his mitigating evidence. No one seriously contends, however, that the jury had an adequate vehicle for giving effect to the evidence of Motley's child abuse under the first special issue, which asks whether the defendant committed the crime deliberately. Such a contention would be without merit. As in <u>Penry</u>, the term "deliberately" was not defined for the jury. <u>See</u> 492 U.S. at 322. Moreover, the State argued, during both voir dire and closing argument, that the term "deliberately" meant essentially the same thing as "intentionally." Thus, like the Supreme Court in <u>Penry</u>, "we cannot be sure that the jury was able to give effect to the mitigating evidence of [Motley's] . . . history of abuse in answering the first special issue." <u>Id.</u> at 323. In short, we agree with Judge Reaveley's observations that evidence of child abuse does not "logically" come into play in considering the deliberateness question. <u>See</u> <u>Penry v. Lynaugh</u>,

2.  The Scope of <u>Penry</u> as Explained in <u>Graham</u> and <u>Johnson</u>

The Supreme Court has interpreted <u>Penry</u> narrowly.[7]  The Court's decisions in <u>Graham v. Collins</u>, 113 S. Ct. 892 (1993), and <u>Johnson v. Texas</u>, 113 S. Ct. 2658 (1993), explain the specific parameters of the <u>Lockett-Eddings-Penry</u> "rule," and it is to those decisions which we now turn to determine whether the federal habeas relief Motley seeks falls within the scope of that "rule."

### a.  <u>Graham v. Collins</u>

The "rule" the petitioner sought in <u>Graham</u> on federal habeas review was that the Texas special issues did not permit the jury to give adequate mitigating effect to the evidence he had proffered.  113 S. Ct. at 897.  Thus, Graham argued that absent additional instruction, the Texas special issues did not provide the jury a vehicle by which it could give effect to his evidence

---

832 F.2d 915, 925 (5th Cir. 1987), <u>aff'd in part, rev'd in part</u>, 492 U.S. 302 (1989).

Nor does anyone contend that the third special issue, which asks whether the defendant's conduct was unreasonable in response to any provocation by the deceased, could have allowed the jury to give effect to Motley's evidence of child abuse.  In fact, the third special issue was not even submitted to the jury in this case because the evidence demonstrated that the victim, Maria Duran, had been shot in the back from approximately thirty feet away.  The third special issue provided absolutely no vehicle for consideration of Motley's evidence of child abuse.  <u>See</u> <u>Penry</u>, 492 U.S. at 324.  Our discussion thus focuses solely on whether the <u>second</u> special issue, the "future dangerousness" issue, provided an adequate vehicle for the jury to give effect to Motley's evidence of child abuse.

[7] <u>See</u> <u>generally</u> Peggy M. Tobolowsky, <u>What Hath <i>Penry</i> Wrought?:  Mitigating Circumstances and the Texas Death Penalty</u>, 19 AMER. J. CRIM. LAW 345 (1992).

of youth, an unstable childhood, and positive character traits.
Id.

Because Graham had petitioned for federal habeas relief,
however, the Court first determined whether granting Graham the
relief he sought would create a "new rule" of constitutional law
under Teague.  Id. at 897.  Although Graham's conviction had
become final in 1984, before Penry had been decided, the Court
concluded that even with the benefit of the Penry decision,
reasonable jurists would not have been "of one mind" in ruling on
Graham's claim and that Graham thus sought a "new rule" under
Teague.

The Court reached its determination by first making it clear
that it did not read Penry "as effecting a sea change" in its
view of the Texas death penalty statute under which Graham was
sentenced because Penry "did not broadly suggest the invalidity
of the special issues framework."  Id. at 901.  The Court then
went on to assert that the rule which Graham sought was not
commanded by the cases upon which Penry rested, i.e., Lockett and
Eddings.  Id. at 902.  As the Court explained, in Penry--as in
Lockett and Eddings--"the sentencer had no reliable means of
giving mitigating effect" to the proffered evidence.  Id.
(emphasis added).  The Court then distinguished Graham's case
from the Lockett-Eddings-Penry line by stating that

> Graham's evidence--unlike Penry's--had mitigating relevance
> to the second special issue concerning his likely future
> dangerousness.  Whereas Penry's evidence compelled an
> affirmative answer to that inquiry, despite its mitigating
> significance, Graham's evidence quite readily could have
> supported a negative answer.

22

Id.  The Court delineated the distinction between Penry's particular case and Graham's by explaining that the jury would not have necessarily answered "yes" to the second special issue in Graham's case because that issue provided the jury a vehicle by which it could "accept the suggestion of Graham's lawyers that his brief spasm of criminal activity . . . was properly viewed, in light of his youth, his background, and his character, as an aberration that was not likely to be repeated."  This distinction led the Court to conclude that the Lockett-Eddings-Penry "rule" did not dictate the relief Graham sought.[8]  Id.  Focusing on the determinative question under Teague, i.e., "whether reasonable jurists reading the case law that existed at the time Graham's conviction became final could have concluded that Graham's sentencing was not constitutionally infirm," the Court held:

> We cannot say that all reasonable jurists would have deemed themselves compelled to accept Graham's claim in 1984.  Nor can we say, even with the benefit of the Court's subsequent decision in Penry, that reasonable jurists would be of one mind in ruling on Graham's claim today.  The ruling Graham seeks, therefore, would be a "new rule" under Teague.

Id. at 903.

---

[8] Moreover, the Court was not convinced that Penry could be extended "to cover the sorts of mitigating evidence Graham suggests without a wholesale abandonment of Jurek . . . ." Graham, 113 S. Ct. at 902.  As the Court explained,
> Graham's evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek's evidence of age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse.

Id.

b. <u>Johnson v. Texas</u>

As had the petitioner in <u>Graham</u>, Johnson argued that the Texas special issues, absent additional instruction, did not permit the jury to give adequate mitigating effect to the evidence he had proffered, i.e., evidence of his youth. <u>Johnson</u>, 113 S. Ct. at 2669. Although <u>Johnson</u> was before the Supreme Court on direct appeal, we find that the Court's analysis of Johnson's claim speaks directly not only to the scope of <u>Penry</u> but also to how the "rule" Johnson requested would be viewed under <u>Teague</u>. This analysis is thus invaluable to our determination of whether granting Motley the federal habeas relief he requests would necessitate the creation of a "new rule" of constitutional law.

In analyzing Johnson's claim, the Court made it clear that it was being "asked to take the step that would have been a new rule had [the Court] taken it in <u>Graham</u>." <u>Id.</u> at 2668. The Court then went on to explain that like Graham, Johnson set forth a claim for relief which fell outside the scope of <u>Penry</u>. <u>Id.</u> at 2669-72.

In reaching this conclusion, the Court concentrated on the fact that Penry's mental retardation and history of abuse, evidenced at trial and sentencing, "<u>prevented</u> him from learning from experience." <u>Id.</u> (emphasis added). The Court explained that although <u>Penry</u> "remained the law and must be given a fair reading," evidence of Johnson's youth fell outside <u>Penry</u>'s ambit because Penry's condition was unequivocally never subject to

24

change and Johnson's youthful state was.  See id. at 2670.  As the Court stated,

> Unlike Penry's mental retardation, which rendered him unable to learn from his mistakes, the ill effects of youth that a defendant may experience are subject to change and, as a result, are readily comprehended as a mitigating factor in consideration of the second special issue.

Id. (emphasis added).

What was important to the Johnson Court, then, was that because Penry was unable to learn from his mistakes due to his "condition," evidence of this "condition" could be given only aggravating effect:  in determining under the second special issue whether Penry was a "continuing threat to society," the jury--without additional instruction--would necessarily have to answer "yes" because Penry's condition was not subject to change, and thus the jury could only regard him as a "continuing threat." On the other hand, Johnson's "condition"--his being youthful--was necessarily subject to change, and the Court thus distinguished Johnson's case from Penry's.

In so doing, the Court indicated that a "fair reading" of Penry, as it remains the law, was that the Texas special issues place a defendant's mitigating evidence beyond jurors' effective reach when that evidence can be given only aggravating effect. That is, as long as a defendant's evidence can be given mitigating effect in some way under the Texas special issues, no additional instruction would be constitutionally required.  See id. at 2671.  As the Court explained, the "rule of Lockett and Eddings,"--which "dictated" the result in Penry--was that "a jury

25

be able to consider _in some manner_ all of a defendant's relevant mitigating evidence," not that "a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant."[9]  _Id._ (emphasis added).

The Court in _Johnson_ also focused on mitigating evidence (such as Motley's evidence of child abuse) that could be viewed by some jurors as aggravating.  The Court held that,

> [a]s we recognized in _Graham_, the fact that a juror might view the evidence of youth as aggravating, as opposed to mitigating, does not mean that the rule of _Lockett_ is violated.  As long as the mitigating evidence is within "the effective reach of the sentencer," the requirements of the Eighth Amendment are satisfied.

_Id._ at 2669 (citations omitted).

### 3.  Application to Motley's Claim

To grant the relief Motley now requests would be to hold that the Eighth Amendment requires that whenever a defendant in a capital case proffers mitigating evidence that has some arguable relevance beyond the Texas special issues, the defendant is entitled, in effect, to an additional "special issue" asking whether any mitigating evidence so proffered, whether or not relevant to the existing special issues, leads the jury to believe that the death penalty should not be imposed.  As our

---

[9] Out en banc decision in _Graham_ aligns itself with this view.  We recognized in _Graham_ that "_Penry_ represents . . . a set of _atypical_ circumstances," i.e., circumstances in which the defendant's mitigating evidence indicated both the absence of potential for rehabilitation and a permanent condition.  _Graham v. Collins_, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc) (emphasis added), _aff'd on other grounds_, 113 S. Ct. 892 (1993).  We also found _Penry_ to be unique because there was _no way_ evidence of Penry's condition "could be given _any_ mitigating force under the second special issue."  _Id._ (emphasis added).

26

analysis of <u>Graham</u> and <u>Johnson</u> makes clear, that is precisely the "rule" that <u>Graham</u> and <u>Johnson</u> held, with the benefit of <u>Penry</u>, to be a "new rule" of constitutional law under <u>Teague</u>.

Motley's evidence of child abuse was not of a necessarily transient condition as was Johnson's evidence of youth. Nonetheless, it was evidence of a transient condition to some degree--and therefore more akin to Graham's evidence than to Penry's. Dr. Fason, who testified about Motley's "condition," stated that Motley would continue to engage in anti-social behavior as a result of his abuse as a child "<u>unless</u> there are certain changes that take place," including somehow instilling in Motley "the feeling that someone cares" (emphasis added). Dr. Fason also testified that the bitterness and hatred engendered in a child abuse victim such as Motley would <u>frequently</u> continue so as to lead Motley to <u>perhaps</u> senselessly assault other people. Although he would not specifically comment on the probability of Motley's being successfully treated, he stated that Motley had a <u>possibility</u> of successful treatment.

Motley's evidence of child abuse--unlike Penry's evidence of mental retardation and child abuse--thus indicated that Motley was subject to change and that Motley was <u>not unable to learn from his mistakes</u>. Even if Motley's evidence, like Penry's, had significance beyond the scope of the first special issue, it is apparent that Motley's evidence--"<u>unlike</u> Penry's--had mitigating relevance to the second special issue concerning his likely future dangerousness." See <u>Graham</u>, 113 S. Ct. at 902. Motley's

27

jury, then, would not have necessarily given <u>only</u> aggravating effect to Motley's evidence under Texas' sentencing scheme without additional instruction. Because the jury was able to consider <u>in some manner</u> Motley's relevant mitigating evidence of child abuse under Texas' sentencing scheme, which is what the <u>Lockett-Eddings-Penry</u> "rule" mandates, <u>see</u> <u>Johnson</u>, 113 S. Ct. at 2671, the relief Motley now requests is not "dictated" by that rule but instead falls outside of its scope.

We therefore cannot say that reasonable jurists hearing Motley's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor. To grant Motley the federal habeas relief he now requests would thus be to create a "new rule" of constitutional law.[10] Further, although <u>Teague</u> itself recognized two exceptions to the general bar on issuing "new rules" of constitutional law on collateral review, <u>see</u> <u>Teague</u>, 489 U.S. at 311, we find both of those exceptions inapplicable in Motley's case.

---

[10] We note that on appeal, the State contends that Motley's <u>Penry</u> claim lacks merit because he has not demonstrated that his criminal behavior was attributable to the abuse he suffered as a child. The State has correctly pointed out that our cases establish that evidence of a petitioner's background or record, in order to be constitutionally mitigating, "must be able to raise an inference 'that the crime is attributable to the disability.'" <u>See</u> <u>Barnard v. Collins</u>, 958 F.2d 634, 638 (5th Cir. 1992) (quoting <u>Graham v. Collins</u>, 950 F.2d 1009, 1033 (5th Cir. 1992) (en banc), <u>aff'd on other grounds</u>, 113 S. Ct. 892 (1993), <u>cert. denied</u>, 113 S. Ct. 990 (1993)). Nonetheless, for purposes of discussing the <u>Teague</u> issue which Motley's <u>Penry</u> claim raises, we have assumed--without deciding--that Motley's evidence of child abuse was constitutionally mitigating.

28

### 4. Motley's Reliance on Mayo v. Lynaugh

Motley also argues that the relief he now requests is dictated by this court's decision in Mayo v. Lynaugh, 893 F.2d 683 (5th Cir. 1990), cert. denied, 112 S. Ct. 272 (1991). However, we find Motley's reliance on Mayo unavailing.

In Mayo, a panel of this court originally upheld the district court's denial of federal habeas relief on Randy Dale Mayo's claim that his jury lacked a vehicle by which to give effect to the mitigating evidence Mayo had submitted during the sentencing phase of his trial. 888 F.2d 134, 140 (5th Cir. 1989). In an opinion released four days after the Supreme Court's decision in Penry, the panel stated:

> We are bound by the precedents of this circuit that have upheld the constitutionality of the Texas [sentencing] statute, and therefore we must deny relief on this claim. That the Supreme Court has granted certiorari in a particular case does not allow us to grant relief to other petitioners who raise a similar claim.

Id. at 140-41 (citations omitted).

Both parties petitioned for rehearing: Mayo, on the basis of the Supreme Court's decision in Penry, and the State, on that same basis and on grounds that Mayo had procedurally defaulted his claim. We denied the petition for rehearing on grounds that Mayo had procedurally defaulted his claim under Texas law and that Mayo had not sufficiently articulated "how the jury was unable to express its reasoned moral response and give effect to his mitigating evidence." 883 F.2d 358, 359-60 (5th Cir.), cert. denied, 109 S. Ct. 1576 (1989).

29

Mayo then filed a second petition for rehearing, in which he argued for the first time that his Penry claim was not procedurally barred because the State had waived the defense and that his Penry claim was entitled to relief on the merits. The State argued that it was excused from failing to raise the procedural-bar issue in state court under Teague. We granted Mayo's petition for rehearing, and it is our disposition of the merits of Mayo's Penry claim on rehearing that forms the basis of Motley's argument in the instant case.

Mayo had proffered evidence of child abuse at his sentencing trial. In particular, Patsy Mayo, Randy Mayo's mother, testified that "her husband began beating Randy when Randy was four or five years old, that Randy had suffered several unexplained broken bones, that [her husband] had made numerous death threats to her and her children, that [her husband's] physical and verbal abuse of Randy was continuous, and that at the time of the sentencing phase, [her husband] was in prison for having raped a child." Mayo, 893 F.2d at 688. Raymond Allison, a friend of the family who had employed both Randy and his father, testified that Randy's subsequent criminal acts were probably the result of his home environment. Id.

This court decided that as in Penry, "the mitigating evidence presented was not accompanied by jury instructions that would have allowed a juror to give effect to her conclusion that Mayo was less morally culpable or otherwise undeserving of death because of his family background or personal circumstances." Id.

30

We thus determined that Mayo's evidence of his history of abuse, abuse which created problems in Mayo that "would stay there for a long time" unless something was done about them, was such that the Texas special issues, in particular the "future dangerousness" issue, did "not afford sufficient opportunity for consideration of the mitigating evidence Mayo offered." Id. Hence, we concluded that Mayo had presented sufficient constitutionally mitigating evidence to warrant additional jury instruction, and we reversed the district court's denial of federal habeas relief. Id. at 689-90.

Motley argues that because his evidence is similar to that which Mayo proffered, the result reached in Mayo compels the same result in the instant case. Although Motley's argument appears at first blush to be a strong one, Motley's reliance on Mayo is for two reasons unavailing. The first reason relates to the status under Teague of the rule Mayo requested and obtained. The second relates to the status of Mayo in the light of Graham and Johnson.

Our opinion in Mayo did not address the status under Teague of the rule that Mayo requested, nor were we compelled to.[11]

---

[11] Although Teague had been decided a month before Mayo filed his original appellate brief and the State, in its petition for rehearing, raised the argument that Mayo's Penry claim was procedurally barred under Teague, the State did not raise the Teague retroactivity issue, and we did not consider it sua sponte. See Wiley v. Puckett, 969 F.2d 86, 96 n.13 (5th Cir. 1992) (explaining that this court may consider the Teague retroactivity issue sua sponte); Smith v. Black, 904 F.2d 950, 981 n.12 (5th Cir. 1990) (same), vacated and remanded on other grounds, 112 S. Ct. 1463 (1992); see also Caspari v. Bohlen, 62 U.S.L.W. 4113, 4115 (U.S. Feb. 23, 1994) ("a federal court may,

31

Hence, there is no ruling, express or implied, in <u>Mayo</u> on whether the rule requested by Mayo was a new rule under <u>Teague</u>. Not surprisingly, the "rule" which Mayo requested on federal habeas review was the same as that requested in <u>Graham</u> and <u>Johnson</u>, and the same as that now being requested by Motley: the Texas special issues were constitutionally infirm because, absent an additional "special issue" or instruction, they did not permit the jury to give adequate mitigating effect to the petitioner's proffered evidence. Although we granted Mayo's request by determining that under <u>Penry</u> the special issues did not provide the jury with a vehicle by which it could give mitigating effect to Mayo's evidence of child abuse, the "rule" created by our decision in <u>Mayo</u> was a "new rule" of constitutional law. The Court's decisions in <u>Graham</u> and <u>Johnson</u> make it clear that "reasonable jurists" reading the case law that existed at the time Mayo's conviction became final in 1986--case law including <u>Lockett</u> and <u>Eddings</u>, which "dictated" <u>Penry</u>--could have disagreed with the panel's conclusion in <u>Mayo</u>. Because Motley's conviction became final <u>before</u> the panel's decision in <u>Mayo</u> was announced, under <u>Teague</u>'s retroactivity bar Motley cannot benefit from

---

but need not, decline to apply <u>Teague</u> if the State does not argue it"); <u>cf.</u> <u>Schiro v. Farley</u>, 114 S. Ct. 783, 788-89 (1994) (discussing that the Court undoubtedly has the discretion to reach the State's <u>Teague</u> argument not raised in the lower courts or in its brief in opposition to the petition for writ of certiorari); <u>Collins v. Youngblood</u>, 497 U.S. 37, 40-41 (1990) (explaining that the <u>Teague</u> bar to the retroactive application of new rules is not jurisdictional).

Mayo's "new rule."  Motley's reliance on Mayo is thus unavailing for purposes of our Teague inquiry.

Finally, we are compelled to agree with the State that Johnson has effectively overruled Mayo.  We see no basis for distinguishing between Mayo's evidence of child abuse and Johnson's evidence of youth.  Unlike Penry's evidence of mental retardation, which rendered him unable to learn from his mistakes, the ill effects of Mayo's child abuse (like the ill effects of Johnson's youth) are subject to change and, "as a result, are readily comprehended as a mitigating factor in consideration of the second special issue."  Johnson, 113 S. Ct. at 2670.


IV.  CONCLUSION

The district court correctly rejected Motley's ineffective assistance of counsel claim.  Further, although Motley properly preserved his Penry claim for federal habeas review, we conclude that the relief he seeks would necessitate the creation of a "new rule" of constitutional law--which is impermissible under Teague. We therefore AFFIRM the district court's decision denying Motley's petition for federal habeas corpus relief.