IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-9006
_____

FLETCHER THOMAS MANN,

                    Petitioner-Appellant,

v.

WAYNE SCOTT, Director
Texas Department of Criminal Justice,
Institutional Division,

                    Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____
(December 21, 1994)

Before KING, HIGGINBOTHAM, and JONES, Circuit Judges.

KING, Circuit Judge:


     Fletcher Thomas Mann, a Texas death row inmate convicted of

capital murder, appeals the district court's denial of his

petition for a writ of habeas corpus.  For the reasons set forth

below, we affirm.


## I.  PROCEDURAL POSTURE

     Mann was convicted of the 1981 murder of Christopher Lee

Bates and sentenced to death by a Texas jury.  Mann's conviction

was affirmed by the Texas Court of Criminal Appeals on October 22, 1986. Mann v. State, 718 S.W.2d 741 (Tex. Crim. App. 1986). The United States Supreme Court denied certiorari on April 6, 1987. Mann v. Texas, 481 U.S. 1007 (1987).

Mann began a collateral attack on his conviction by filing his first petition for a writ of habeas corpus and stay of execution in the Criminal District Court of Dallas County, Texas; the judge recommended that Mann's petition be denied on the merits. On June 23, 1987, the Texas Court of Criminal Appeals accepted the state trial court's recommendation and denied Mann's petition in an unpublished opinion. The same day, Mann filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Texas. The district court granted a temporary stay of execution, but ultimately found Mann's petition to be meritless. Mann v. Lynaugh, 688 F. Supp. 1121 (N.D. Tex. 1987). Mann next filed notice of appeal to this court, which dismissed the appeal because it was not timely filed. Mann v. Lynaugh, 840 F.2d 1194 (5th Cir. 1988).

On June 17, 1988, Mann filed a motion for relief from judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, claiming that his trial counsel's negligent failure to file a timely appeal should not deny him his right to appellate review. While Mann's 60(b) motion was pending in federal district court, Mann simultaneously filed another petition for a writ of habeas corpus with the Texas Court of Criminal Appeals.

2

The federal district court granted Mann's 60(b) motion, staying his execution; it also retained jurisdiction over the case and directed Mann to exhaust state court remedies on certain new claims.  Mann v. Lynaugh, 690 F. Supp. 562 (N.D. Tex. 1988). The Texas Court of Criminal Appeals dismissed Mann's petition without prejudice on grounds that Mann was required by state law to first seek relief from the state trial court.  Mann filed his petition with the state trial court on July 12, 1988; however, the state trial court abstained on grounds of comity because the federal district court still retained jurisdiction.

On November 10, 1988, the federal district court lifted its stay of Mann's execution, thereby relinquishing its jurisdiction over the case and freeing the state courts to proceed.  Mann then refiled his habeas petition in state court.  On January 10, 1989, in an unpublished opinion, the Texas Court of Criminal Appeals denied relief on the recommendation of the state trial court. Since there was no longer any stay order in effect, Mann's execution was scheduled for December 5, 1990.

Mann next sought and received a stay of execution and leave to reinstate his federal habeas petition in the federal district court.[1]  The federal magistrate to whom Mann's case was assigned recommended that relief be denied.  On September 7, 1993,

---

[1] The state does not argue that Mann's second federal habeas petition constituted an abuse of the writ in violation of McCleskey v. Zant, 499 U.S. 467 (1991), perhaps on the theory that the district court's withdrawal of its original opinion precludes such an argument.  We express no opinion on the merits of such a theory had it been argued.

following a *de novo* review, the federal district court concurred with the magistrate and entered final judgment denying relief. Mann then filed a timely notice of appeal. Shortly thereafter, the district court issued a certificate of probable cause. For the reasons set forth below, we affirm.

## II. FACTUAL BACKGROUND

In the early evening hours of September 11, 1980, Mann and Martin David Verbrugge knocked on the door of a Dallas apartment shared by Christopher Bates and Robert Matzig, who were watching a football game with their friend Barbara Hoppe. When Matzig answered the door, Mann and Verbrugge brandished pistols and forced their way inside. Bates and Matzig were instructed to lie on their stomachs on the living room floor and were bound at the arms and legs. Mann and Verbrugge went through their pockets and took their money. Hoppe was taken into the bedroom, where she was beaten, raped and stabbed to death.

Mann exited the bedroom and pointed a gun at the back of Matzig's head. Matzig pleaded for his life, offering to write Mann a check for the full amount in his account. Mann and Verbrugge agreed and ordered Matzig to write several smaller checks and cash them at local grocery stores. Over the next several hours, the four men drove around Dallas in Matzig's car, attempting to cash Matzig's checks. Bates and Matzig were held under gunpoint the entire time. Due to the late hour, Matzig was able to cash only about $75.00 worth of checks. Matzig wrote a

4

final check in the amount of $1,000 which was to be cashed by Mann or Verbrugge the following morning.

Mann directed Matzig to drive to a secluded area. When Mann and Verbrugge alighted from the car, Matzig attempted to drive away, but the car stalled. Mann and Verbrugge forced Matzig and Bates from the vehicle, took them into the woods, and ordered them to lie on their stomachs. Matzig saw Mann standing over Bates' head, preparing to shoot. Matzig tried to run away, but he tripped and fell. Bates was shot in the back of the head with a .38 revolver. Matzig was shot in the neck with a .38 revolver and was severely wounded, but still alive. Matzig heard the gunshots, but he did not see who pulled the trigger. Mann and Verbrugge fled the scene in Matzig's car. Meanwhile, Matzig crawled to a nearby bulk mail center and was rescued. Fearing that Matzig was not dead, Mann and Verbrugge returned to the scene to finish the job; however, the authorities had already arrived on the scene, and the two fled once again.

Mann was charged with murdering Bates in the course of robbing Matzig, a capital crime under Texas law. TEX. PENAL CODE ANN. § 19.03(a)(2) (West 1994).[2] Pursuant to article 37.071 of

---

[2] Section 19.03 states in relevant part:
    (a)  A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and:
. . . .

    (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation . . . .

TEX. PENAL CODE ANN. § 19.03 (West 1994).

the Texas Code of Criminal Procedure, the jury answered each of

6

three special issues[3] in the affirmative, and Mann was sentenced

---

[3] The three special issues are set forth in article 37.071 of the Texas Code of Criminal Procedure which, at the time of Mann's offense, read in relevant part:

*Procedure in a capital case*

(a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection shall not be construed to authorized the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.
   (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
   (1) whether the conduct of the defendant that caused the death of the decedent was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
   (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
   (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

. . . .

   (e) if the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life. . . .

TEX. CODE CRIM. PROC. ANN. art. 37.071 (West 1981).

It should be noted that article 37.071 has since been revised, but the revisions apply only to offenses committed after September 1, 1991. See TEX. CODE CRIM. PROC. ANN. art. 37.071(i) (West Supp. 1994).

to death by lethal injection.

### III.  STANDARD OF REVIEW

In considering a federal habeas corpus petition presented by a prisoner in state custody, federal courts must generally accord a presumption of correctness to any state court factual findings. See 28 U.S.C. § 2254(d).  We review the district court's findings of fact for clear error, but decide any issues of law *de novo*. Barnard v. Collins, 958 F.2d 634, 636 (5th Cir. 1992), cert. denied, 113 S. Ct. 990 (1993); Humphrey v. Lynaugh, 861 F.2d 875, 876 (5th Cir. 1988), cert. denied, 490 U.S. 1024 (1989).

### IV.  ANALYSIS

Mann posits eight arguments in his petition to this court: (1) his confession was obtained in violation of his Sixth Amendment right to counsel; (2) the trial court's failure to instruct the jury on the lesser included offense of murder violated his Fourteenth Amendment right to due process; (3) the Texas sentencing statute unconstitutionally prevented him from introducing mitigating evidence at trial; (4) the trial court unconstitutionally excluded certain venire members for cause; (5) the prosecutor's closing comments regarding the word "deliberate" in the Texas capital sentencing statute violated state law and rendered his conviction constitutionally defective; (6) his trial counsel was constitutionally ineffective; (7) the prosecutor's closing argument unconstitutionally misled jurors into believing

8

that they were not responsible for imposing the death sentence; and (8) the federal district court erred by refusing to hold an evidentiary hearing regarding certain mitigating evidence. We analyze each of these claims.

*A. Sixth Amendment Right to Counsel.*

Mann argues that the state trial court erred in allowing his confession to be placed before the jury because it was obtained in violation of his Sixth Amendment right to counsel. Specifically, Mann contends that the police knowingly circumvented his right to have counsel present during his interrogation in violation of Maine v. Moulton, 474 U.S. 159 (1985).

*1. Factual Background.*

A brief recitation of the events leading up to Mann's confession is required in order to fully evaluate his claim. In June 1981, the Dallas police learned that Mann was being held in custody in Bulitt County, Kentucky, on an unrelated rape charge. Detective Gholston of the Dallas Police Department travelled to Kentucky to serve arrest warrants on Mann and to attempt to interview him.

Upon his arrival in Kentucky, Detective Gholston read Mann his Miranda rights and informed Mann that he wanted to speak with him following his arraignment on the Texas charges. The Kentucky court appointed a local attorney, Sean Delahanty, to represent Mann at the arraignment. Following the arraignment and

consultation with Mann, Delahanty informed Gholston that Mann was willing to talk, but only if Delahanty were present and asked the questions.  Gholston rejected these terms.  Delahanty remained at the jail until the close of visiting hours, hoping to ward off an interrogation of Mann.

Later that afternoon, officer Ronnie Popplewell of the Bulitt County Sheriff's Department told Gholston that he intended to transport Mann to a hospital in Louisville (approximately 25 miles away) in order to obtain a blood sample for use in the Kentucky rape charge.  Gholston, who had lost his luggage on the flight from Dallas to Louisville, asked Popplewell if he could ride along and stop at the airport to check on his luggage. Popplewell agreed, and the trio set off for Louisville with Popplewell behind the wheel, and Gholston and Mann in the back seat.

There is conflicting trial testimony as to precisely what conversation took place during the trip to Louisville.  Gholston and Popplewell testified that Mann initiated conversation regarding the Texas charge and that he was curious to know what information the police had regarding that crime.  Conversely, Mann testified that he told Gholston that he did not want to talk and that he wanted a lawyer, but was told that he did not need one.

Once the trio returned to the police station in Bulitt County, several facts are undisputed:  (1)  Gholston called the Dallas Police Department and asked them not to question Mann's

10

mother; (2) Gholston asked Mann if he would like to make a statement, to which Mann responded affirmatively; (3) Gholston read Mann his <u>Miranda</u> rights and asked Mann if he understood them, including his right to counsel; (4) Mann stated that he understood each of his <u>Miranda</u> rights; (5) Mann made an oral confession which was simultaneously transcribed in longhand by Popplewell; (6) Popplewell typed the confession and presented it to Mann; (7) the typed confession was read out loud to Mann to ensure its accuracy; (8) the top of each page of the typed confession contained a recitation of the <u>Miranda</u> warnings and a statement that those rights were being knowingly, intelligently, and voluntarily waived;[4] (9) Mann read the confession and signed each of the four pages.

---

[4] The confession was typed on a preprinted voluntary statement form which contained the following recitation at the top of each page:

I am giving this statement to ___J.M. Gholston___ I.D. __2297__, who has identified himself as Peace Officer of the City of Dallas, Texas, and he has duly warned me that I have the following rights:  that I have the right to remain silent and not make any statement at all; that any statement I make may be used against me at my trial; that any statement I make may be used as evidence against me in court; that I have the right to have a lawyer present to advise me prior to and during any questioning; that if I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and that I have the right to terminate the interview at any time.

Prior to and during the making of the statement, I have and do hereby knowingly, intelligently, and voluntarily waive the above explained rights and I do make the following voluntary statement to the aforementioned person of my own free will and without any promises or offers of leniency or favors, and without compulsion or persuasion by any person or persons whomsoever:
. . . .

11

*2. Standard of Review.*

Whether a constitutional right has been waived-- including the Sixth Amendment right to counsel-- is a question of federal law over which we have plenary review power. <u>Brewer v. Williams</u>, 430 U.S. 387, 397 n.4 (1977); <u>Self v. Collins</u>, 973 F.2d 1198, 1204 (5th Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 1613 (1993). However, in the interest of comity, federal courts must presume the correctness of underlying state court factual determinations absent proof of some defect in the factfinding process. 28 U.S.C. § 2254(d); <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981).

We do not lightly find a waiver of a constitutional right. Courts must "indulge in every reasonable presumption against waiver," <u>Brewer</u>, 430 U.S. at 404; thus, the state bears the burden of proving that an "intentional relinquishment or abandonment" of the right has occurred. <u>Id.</u> (quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938)). Whether a voluntary, knowing, and intelligent waiver of constitutional rights has occurred is determined according to the totality of the circumstances, including the background, experience, and conduct of the accused. <u>Edwards v. Arizona</u>, 451 U.S. 477, 482 (1981).

Thus, in the case at hand, the state bears the burden of proving that Mann knowingly, intelligently, and voluntarily waived his Sixth Amendment right to counsel.[5] We must therefore

_____

[5] The parties do not dispute that the Sixth Amendment right to counsel had attached in this case. We agree that this is the correct conclusion. <u>See</u> <u>United States v. Gouveia</u>, 467 U.S. 180 (1984) (arraignment signals initiation of adversarial proceedings necessary to trigger the Sixth Amendment); <u>Barnhill v. State</u>, 657

12

look to the totality of the circumstances to determine if a valid waiver occurred.

*3. Analysis.*

The state argues that <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981), provides the contours of analysis regarding waiver of the Sixth Amendment right to counsel. In <u>Edwards</u>, the Supreme Court held that interrogation of the accused must cease upon invocation of his *Fifth* Amendment-- not *Sixth* Amendment-- right to counsel, unless the accused "initiates further communication, exchanges, or conversations with the police." <u>Id.</u> at 485. In <u>Michigan v. Jackson</u>, 475 U.S. 625 (1986), the Court extended the <u>Edwards</u> prophylactic "no further interrogation" rule to the Sixth Amendment context. The Court held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." <u>Id.</u> at 636.

We assume in this case that Mann had asserted his right to counsel prior to the time his confession was obtained, and the parties do not contend otherwise. Thus, the rule of <u>Jackson</u> prohibited "police-initiated interrogation" of Mann. At the close of the suppression hearing that preceded Mann's trial, the state trial court made these oral findings:

> THE COURT: All right. First off, the Court will observe that all of the testimony establishes that the

S.W.2d 131 (Tex. Crim. App. 1983) (adversarial proceedings begin in Texas with filing of criminal complaint).

13

confession was freely and voluntarily given.  Further,
it will be the ruling of the Court that the giving of
the confession was not tainted in any way by any
conduct of any law enforcement officer.

Further, the Court will find specifically that,
under the believable testimony, that [sic] the
confession was obtained from the defendant at a time in
which he was voluntarily willing to talk and was not
requesting an attorney or objecting to being
interrogated.

. . .

I'm going to allow the statement to be admitted
for the jury's consideration.

The district court concluded that in making these findings, the

state trial judge necessarily found that Mann initiated the

conversations with Gholston during the trip to Louisville.

Although it is difficult to reach that conclusion when examining

only the findings themselves, when we look at those findings in

the context of the argument made by Mann's counsel, we agree.

Mann's counsel argued to the state trial judge that the Supreme

Court cases of Edwards, Rhode Island v. Innis, 446 U.S. 291

(1980), and Brewer v. Williams, 430 U.S. 387 (1977), imposed an

initiation requirement in the Sixth Amendment context whereby the

state was required "to desist approaching [Mann] any further,"

once Mann's Sixth Amendment right to counsel had attached.

Mann's counsel contended that by approaching Mann outside the

presence of counsel the police "were specifically going against

the tenets of those cases."

Against the backdrop of that argument, and faced with a

conflict in the testimony about who initiated the conversation

which led to Mann's confession, the district court believed that

14

the state trial court had credited the testimony of the police officers and implicitly found that Mann had initiated the conversation.[6]  See Marshall v. Lonberger, 459 U.S. 422 (1983) (court is presumed to have implicitly found facts necessary to support its conclusions).  The district court also noted that the state trial court explicitly found that Mann waived his right to consult with his attorney or to have him present when the confession was given.  Again, in the context of the testimony and the argument of Mann's counsel, we agree.  These factual findings are entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(d), and Mann has offered no evidence to overcome this presumption.  Thus, Mann's Sixth Amendment claim must fail.

Mann's counsel argues that the key issue regarding waiver in this case is not whether Mann "initiated" any conversation with police, but whether the state notified Mann's counsel prior to engaging in interrogation and obtaining the confession, as Mann's counsel testified he had requested.  As authority for that proposition, Mann cites Maine v. Moulton, 474 U.S. 159 (1985), which condemns "knowing[] circumventi[on] [of] the accused's right to have counsel present in a confrontation between the accused and a state agent."  Id. at 176.  Neither Maine nor any other case that predates the denial of Mann's petition for certiorari stands for the proposition that the Sixth Amendment is

_____

[6] This fact alone distinguishes Mann's case from Felder v. McCotter, 765 F.2d 1245 (5th Cir. 1985), cert. denied, 475 U.S. 1111 (1986), on which Mann places heavy, but unavailing, reliance.  In Felder, we emphasized that Felder had not initiated the interview with the police.  Id. at 1249-50.

15

violated when the police accept a defendant's invitation to engage in conversation about the crime without first notifying the defendant's counsel, even when the defendant's counsel has demanded that he be so notified. Were we to adopt such a rule, it would create a "new rule" of constitutional law under Teague v. Lane, 489 U.S. 288 (1989) (per curiam), and its progeny. Under Teague, a "new rule" is one which was not "dictated by precedent existing at the time the defendant's conviction became final." Id. at 301; see also Graham v. Collins, 113 S. Ct. 892, 897 (1993). Unless a reasonable jurist hearing petitioner's claim at the time his conviction became final "would have felt compelled by existing precedent" to rule in his favor, we are barred from now doing so under the edict of Teague and its progeny. Saffle v. Parks, 494 U.S. 484, 488 (1990); Graham, 113 S. Ct. at 898. We are not persuaded that a reasonable jurist hearing Mann's claim at the time his conviction became final would have felt compelled to rule in his favor; accordingly, we are barred from doing so. [7]

*B. Failure to Provide Lesser Included Offense Instruction.*

Mann next contends that his Eighth and Fourteenth Amendment rights were violated when the state trial court refused a

---

[7] Mann recognizes that our opinion in Self v. Collins, 973 F.2d 1198 (5th Cir. 1992), cert. denied, 113 S. Ct. 1613 (1993), held that "[a] defendant [who is represented by counsel] may waive his [Sixth Amendment] right to counsel without notice to counsel." Id. at 1218. Mann argues that Self is wrongly decided. We disagree, but in any event we are bound.

16

requested jury instruction on the lesser included offense of murder.  In the seminal case of Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court held that an instruction regarding a lesser included offense is constitutionally required in capital cases "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense-- but leaves some doubt with respect to an element that would justify conviction of a capital offense."  Id. at 637.  Later, in Hopper v. Evans, 456 U.S. 605 (1982), the Supreme Court clarified that "Beck held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction.  But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction."  Id. at 611.  Thus, our task is to determine whether "the jury could rationally acquit on the capital crime and convict for the noncapital crime."  Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir.), cert. denied, 486 U.S. 1061 (1988); accord Hopper, 456 U.S. at 612; Keeble v. United States, 412 U.S. 205, 208 (1973).  We conclude that no rational jury could have acquitted Mann on the capital murder charge and convicted him on a noncapital murder charge; thus, failure to provide an instruction as to the lesser included offense of murder did not violate Mann's constitutional rights.

Mann was charged with the capital crime of "intentionally commit[ting] [] murder in the course of committing or attempting to commit . . . robbery."  TEX. PENAL CODE ANN. § 19.03(a)(2) (West

17

1994).  Mann argues that a jury could rationally have acquitted him of this capital crime because the state failed to prove, beyond a reasonable doubt, that the murder of Bates occurred "in the course of committing or attempting to commit . . . robbery," within the meaning of § 19.03(a)(2).  Specifically, Mann contends that there is a reasonable doubt as to whether the robbery of Matzig was "completed" by the time Bates was murdered.  We decline to accept such a tortured interpretation of the Texas statute.

The language "in the course of" has been construed to mean conduct that occurs in an attempt to commit, during the commission, or in immediate flight after an attempt or actual commission of robbery.  Barnes v. State, 845 S.W.2d 364, 367 (Tex. Crim. App. 1992); Fierro v. State, 706 S.W.2d 310, 313 (Tex. Crim. App. 1986); Riles v. State, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980) (en banc); cf. TEXAS PENAL CODE ANN. § 29.01(1) (West 1994) (providing an analogous definition to the phrase "in the course of committing theft").  Robbery, by statutory definition, is essentially "theft plus"-- namely, it is theft accomplished by the use of physical force or threats of bodily injury.  See TEXAS PENAL CODE ANN. § 29.01(a) (West 1994).  Thus, in order for a murder to be "in the course of" robbery it must be "in the course of" committing a theft by force or threats of bodily injury.  Id.

The key issue in this case, therefore, is whether a rational jury could have found that Mann was not "in the course of

18

committing theft" at the time of Bates' murder.[8]  Under either of

two alternative, independent grounds, we conclude that no

rational jury could find that the theft had been "completed" at

the time Bates was murdered.

First, the Texas Court of Criminal Appeals has construed the

phrase "in the course of" to include murder that occurs during a

continuous assaultive action, even if the murder occurs at a

different time or place than the robbery:

> [W]e cannot subscribe to the Legislature an intent to
> provide for capital murder . . . only where the killing      takes
> place at the same place and about the same time of the
> robbery and permit a defendant who has committed a robbery  to
> escape capital murder charges where he removes the      robbery
> victim from the scene and takes him or her to      another place
> and there kills the victim to prevent the    victim's testimony.

Moore v. State, 542 S.W.2d 664, 675 (Tex. Crim. App. 1976), cert.
denied, 431 U.S. 949 (1977).

Furthermore, in Dorough v. State, 639 S.W.2d 479, 480-81

(Tex. Crim. App. 1982), the Texas Court of Criminal Appeals

clarified that when significant elements of the enumerated felony

continue uninterrupted, the enumerated felony is kept "alive" for

purposes of the felony murder statute.  Id.  For example, in

Dorough, the continued use of force and threats directed against

a couple kept "alive" an aggravated sexual assault for purposes

of the capital murder statute, despite the fact that the murder

occurred approximately 45 minutes after the last sexual

encounter.  Id.

---

[8]  The parties wisely do not dispute that, at the time of
Bates' murder, Matzig and Bates were being threatened with bodily
injury.  Therefore, we assume this element of robbery was proven
beyond a reasonable doubt.

19

We think Moore and Dorough make it unmistakably clear that Mann was "in the course of" committing robbery when Bates was murdered. Matzig was under forcible custody and undoubtedly in fear of bodily injury at the time of the murder. Thus, a significant element of robbery-- the use of force or threats-- was present at the time of the murder. There is no reasonable doubt that the continuous assaultive conduct kept the robbery of Matzig "alive" for purposes of Mann's capital murder charge.

Mann contends that a rational jury could have determined that the murder of Bates was a mere "afterthought" unconnected to the robbery. We need only note that this contention is completely lacking in evidentiary support. Indeed, Mann's own confession, which was placed before the jury, flatly contradicts this contention. The confession relates that after driving around town attempting to cash checks, Matzig asked Mann and Verbrugge if they wanted to be dropped off anywhere, to which Mann replied:

> I told them no, and to drive where I told them, because I knew the roads. And [Verbrugge] raised up to the passenger seat and told me-- you know what we are going to have to do. And I said, yea. Then [Matzig and Bates] started to-- they knew what we were going to do and were saying-- please don't do it to us, we won't say nothing. Then I told him to stop the jeep right there and told them to get out. Then [Verbrugge] said you take care of them cause I took care of the woman. . . .

This evidence unequivocally reveals that the murder of Bates was not a mere "afterthought," but a coldly calculated attempt to prevent future testimony. No rational jury could have found otherwise on the evidence before it.

Alternatively, Mann suggests that the murder was intended to prevent testimony regarding the rape or kidnapping-- not the robbery-- and that such a motive would take this case outside the ambit of <u>Moore</u>. We disagree. Whether Mann's motive in killing Bates was a desire to cover up the robbery, rape, kidnapping-- or some combination thereof-- is irrelevant. The key factor, according to <u>Moore</u>, is that the murder occur for the purpose of preventing testimony of the assaultive conduct perpetrated against the victim. The fact that a victim is murdered in order to prevent testimony about rape or kidnapping does not mean that the murder did not occur "in the course of" a robbery. So long as the murder was committed in the course of the charged enumerated felony, it matters not whether the murder was intended to silence testimony about the specific felony charged or another crime which occurred during the continuous assaultive conduct.

A second, independent reason for concluding that no rational jury could have found the robbery had been "completed" at the time of the murder is that the statute plainly says otherwise. Under the Texas Penal Code, robbery has five elements: (1) appropriation; (2) of the property of another; (3) without the owner's consent; (4) by force or threat of imminent bodily injury; (5) with an intent to permanently deprive. <u>See</u> TEXAS PENAL CODE ANN. §§ 29.02(a), 31.03(a). When each of these elements has occurred, the offense is ripe for purposes of prosecution, <u>One 1985 Chevrolet v. State</u>, 852 S.W.2d 932 (Tex. 1993); <u>Barnes v. State</u>, 824 S.W.2d 560 (Tex. Crim. App. 1991); however, the

21

elements may be considered "ongoing" for purposes of the capital felony murder statute. The question, therefore, is whether any of these five elements of robbery was "ongoing" at the time of Bates' murder.

At least two of the elements of robbery were "ongoing" at the time of Bates' murder. First, as discussed earlier, the element of force or threat of imminent bodily injury continued up until the time of the murder. As this significant element of robbery was continuing at the time of the murder, the rule of Moore and Dougherty, *supra*, demands the conclusion that the robbery had not ended.

Second, we believe the element of appropriation was also continuing at the time of the murder. Matzig's uncontroverted testimony is that he wrote a check in the amount of $1,000 which was to be cashed by Mann and Verbrugge when the banks opened the following morning. Thus, while Mann and Verbrugge undoubtedly had the check in their physical possession, the money represented by the check (i.e., $1,000 cash) was not in their control at the time of the murder. Thus, in order for the theft of the $1,000 to be "completed," it was necessary that Mann or Verbrugge cash the check or deposit it into an account over which they had control. See Evans v. State, 444 S.W.2d 641 (Tex. Crim. App. 1969); Jones v. State, 672 S.W.2d 812 (Tex. Ct. App. 1983), aff'd in part and rev'd in part on other grounds, 672 S.W.2d 798 (Tex. Crim. App. 1984); White v. State, 632 S.W.2d 752 (Tex. Ct. App. 1981). Because the attempted appropriation of the $1,000 was

22

continuing at the time of Bates' murder, the attempted robbery was likewise ongoing. Thus, no rational jury could conclude that the robbery had ended at the time of the murder, and the murder was accordingly committed "in the course of committing or attempting to commit . . . robbery" within the meaning of the Texas capital murder statute. TEX. PENAL CODE ANN. § 19.03(a)(2).

*C.  Penry Claim.*

In Penry v. Lynaugh, 492 U.S. 302 (1989), the Supreme Court held that the Texas capital sentencing statute unconstitutionally prohibited the jury from giving weight to Penry's mitigating evidence of mental retardation. In the present case, the district court, on the recommendation of the magistrate, concluded that Mann's Penry claim is procedurally barred for his failure to place such evidence before the jury during trial. Mann argues that his Penry claim is not procedurally barred because: (1) the magistrate misunderstood prior Fifth Circuit precedent on this issue; (2) even if the magistrate did not misunderstand our precedents, those precedents have incorrectly interpreted Penry; and (3) the Texas sentencing statute is unconstitutional as applied.

We turn first to the argument that the magistrate below misunderstood our prior decisions which have applied a procedural bar to Penry claims when the petitioner has not actually proffered the mitigating evidence during trial. E.g., Motley v. Collins, 18 F.3d 1223, 1228 (5th Cir. 1994); Black v. Collins,

23

962 F.2d 394, 407 (5th Cir.), cert. denied, 112 S. Ct. 2983 (1992); Lincecum v. Collins, 958 F.2d 1271, 1282 (5th Cir.), cert. denied, 113 S. Ct. 417 (1992); Barnard v. Collins, 958 F.2d 634, 637 (5th Cir. 1992), cert. denied, 113 S. Ct. 990 (1993); Wilkerson v. Collins, 950 F.2d 1054, 1061 (1992), cert. denied, 113 S. Ct. 3035 (1993); May v. Collins, 904 F.2d 228, 232 (5th Cir. 1990), cert. denied, 498 U.S. 1055 (1991); DeLuna v. Lynaugh, 890 F.2d 720, 722 (5th Cir. 1989). Specifically, Mann contends that the first case to apply this procedural bar to a Penry claim, DeLuna v. Lynaugh, 890 F.2d 720 (5th Cir. 1989), has been impermissibly broadened by May and its progeny. According to Mann, DeLuna was meant to stand for the narrow proposition that decisions not to introduce mitigating evidence based upon considerations *other than* the Hobson's Choice posed by the Texas sentencing statute will be procedurally barred.

While it is true that the decision to keep mitigating evidence away from the jury in DeLuna was based upon trial counsel's fear that such evidence would "open the door" to evidence of the accused's prior criminal record, DeLuna, 890 F.2d at 722, nothing in DeLuna itself or our subsequent cases has so limited it. Indeed, our subsequent decisions embodied in May and its progeny have made it clear that *any* Penry claim will be procedurally barred if the mitigating evidence is not actually proffered at trial. Motley, 18 F.3d at 1228; Black, 962 F.2d at 407; Lincecum, 958 F.2d at 1282; Barnard, 958 F.2d at 637; Wilkerson, 950 F.2d at 1061; May, 904 F.2d at 232.

24

Mann also contends that the magistrate's analysis of his _Penry_ claim is defective because it relied upon prior decisions of this court that he claims have impermissibly narrowed _Penry_. Even assuming _arguendo_ that the magistrate or district court relied on other cases besides _DeLuna_ and _May_ and their progeny, we need not address this issue because we find that the procedural bar just discussed is an adequate ground for deciding this issue.

Mann's final contention regarding his _Penry_ claim is that the Texas sentencing statute is unconstitutional as applied to him because it "chilled" his ability to provide the jury with mitigating evidence of his low intelligence and abusive childhood. This "chilling" effect springs from the fact that under the Texas capital sentencing statute, some evidence is "double edged"-- i.e., the evidence may be simultaneously mitigating and aggravating because it may make it more likely that the jury will answer "yes" regarding the special issues. Mann contends that this Hobson's Choice dilemma violated his right to due process. We have previously declined invitations to declare the Texas sentencing statute unconstitutional because of such an alleged "chilling effect." See _Lackey v. Scott_, 28 F.3d 486, 490 (5th Cir. 1994); _Andrews v. Collins_, 21 F.3d 612, 630 (5th Cir. 1994); _Black v. Collins_, 962 F.2d 394, 407 (5th Cir. 1992); _May_, 948 F.2d at 167-68. We continue to adhere to our statement in _Andrews_ that "a constitutional violation does not result simply because the Texas death penalty scheme triggers

certain tactical choices on the part of counsel."  Andrews, 21 F.3d at 630.

D.  *Juror Exclusion.*

Mann asserts that the state trial court improperly excluded four jurors for cause because they voiced emotional opposition to the death penalty.  Specifically, Mann asserts that permitting exclusion in these circumstances violated the rule of Witherspoon v. Illinois, 391 U.S. 510 (1968), and Adams v. Texas, 448 U.S. 38 (1980).

The magistrate and the district court both rejected this argument on grounds that the state trial court's decision to exclude jurors for their views on capital punishment is entitled to a presumption of correctness which Mann had not overcome. Mann v. Lynaugh, 688 F. Supp. 1121, 1123-24 (N.D. Tex. 1987); see also Wainwright v. Witt, 469 U.S. 412, 429 (1985) (holding that a trial judge's decision to exclude jurors based upon their views of capital punishment is entitled to § 2254(d)'s presumption of correctness).  Under the rule of Wainwright, the decisive question is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. at 424 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).

The gravamen of Mann's complaint is that the prosecutor's use of a hypothetical "intellectual/emotional dilemma" during voir dire misled the potential jurors into believing that

26

emotional opposition to the death penalty would render them unable to uphold their oath as jurors.  Under this line of questioning, the prosecutor told the prospective jurors that they would be required to take the following oath:

> You and each of you do solemnly swear that in the case of The State of Texas against the defendant, you will a true verdict render *according to the law and the evidence*, so help you God.

TEX. CODE CRIM. PROC. ANN. art. 35.22 (West 1989).

The prosecutor asked the prospective jurors if they would be able to impose the death penalty if they emotionally believed that Mann did not deserve to die but intellectually they knew the evidence required that the special issues should be answered affirmatively.  Each of the four excluded venire members informed the prosecutor that faced with such a dilemma, they would not be

able to take the oath.[9]  The prosecutor challenged each of these jurors for cause, and the trial court excused them.

Mann specifically contends that in upholding the trial court's exclusion, the magistrate and the district court failed to consider <u>Adams v. Texas</u>, 448 U.S. 38 (1980), and <u>Witherspoon v. Illinois</u>, 391 U.S. 510 (1968).  In <u>Witherspoon</u>, the Court held that the state has no valid interest in excluding a juror for "any broader basis" than an inability to follow the law or abide by their oaths.  <u>Witherspoon</u>, 391 U.S. at 522 n.21.  The Court made it clear, however, that

> nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were

---

[9] The voir dire of venire member Tingle is representative of the questions asked of the other venire members:

> Q.  All right.  Now, when you say I don't think I could, I know that's just a way of saying it, but we need something clear and unequivocal.  Are you saying, "I could not take that oath"?  Because if you can take the oath to base your verdict strictly on the evidence, then we're right back to square one.
>     See, if you can take the oath to base your verdict just on the evidence, then you're saying that "Even though I feel like he should not die, I can go on and answer the question.  I can compute the answers and come up with them and reach them."
>     So if you tell us that you cannot take that oath, then you're not qualified and that would be-- that would be it.
>
> A.  I can't take that oath.
> Q.  Fine.  Are you firm and fixed on that, then?
> A.  Yes.

. . . .

> Q.  And so that no matter what degree of evidence they produced you could never answer the question "yes"?
> A.  If I thought he should live and be imprisoned, I could not give him the death penalty.

28

those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.

Id.

In Adams, the Court overturned a death sentence because potential jurors had been excluded for admitting that their opposition to the death penalty would render them unable to take the then-existing Texas jury oath which required:

A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life *will not affect his deliberations on any issue of fact.*

TEX. PENAL CODE ANN. § 12.31(b) (1974) (repealed).

The constitutional infirmity in Adams was with the *oath itself*, which by its terms prohibited jurors from taking account of their emotions in deciding issues of fact. The Adams Court made it clear, however, that the state has a "legitimate interest in obtaining jurors who [can] follow their instructions and *obey their oaths*," Adams, 448 U.S. at 44 (emphasis added), provided, of course, that the oath itself is not constitutionally defective. The Court recognized that, given a properly worded oath, the Texas scheme would be constitutionally acceptable:

[i]f the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the Witherspoon doctrine when it excludes potential jurors who are unable or unwilling to address the penalty questions.

Id. at 46.

29

We think Witherspoon and Adams make it unmistakably clear that it is constitutionally permissible to exclude a venire member for cause when it is clear that she cannot faithfully render a verdict according to the evidence. If state law mandates the imposition of the death penalty under certain circumstances and the state proves those circumstances beyond a reasonable doubt, a juror's emotional opposition to capital punishment may, in certain instances, distort her ability to uphold the law. While it is true, as Adams makes clear, that mere emotional opposition to capital punishment alone is insufficient cause for juror exclusion, it is equally clear that emotional opposition may rise to the level where it interferes with a potential juror's ability to sit as a dispassionate and objective arbiter of justice. If a prospective juror's emotional opposition is so severe that it compels her to ignore the law or disables her from answering the statutory questions without conscious distortion or bias, exclusion for cause is proper. Adams, 448 U.S. at 50.

Under the facts of this case, we agree with the district court's conclusion that the presumption of correctness of the trial court's exclusion of these four jurors has not been overcome. The prosecutor's "intellectual/emotional dilemma," while certainly no model of clarity, did manage to convey to the prospective jurors a correct interpretation of the Texas capital sentencing statute. A venire member who cannot answer the special issues "yes" despite the fact that the evidence requires

30

a "yes" answer is, by definition, unable to render a verdict "according to the law and the evidence" as required by the Texas oath.

Furthermore, as the Supreme Court stated in <u>Witt</u>:

What common sense should have realized experience has proven; many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference *must be paid to the trial judge who sees and hears the jurors.*

<u>Witt</u>, 469 U.S. at 424-26.

The state trial judge in Mann's case was in a far better position than we to draw conclusions about the potential jurors' ability to render a verdict in accordance with the law and evidence. The record reveals that he posed several questions of his own to the excluded venire members before excusing them for cause. He determined, based upon their answers and demeanor, that they were not qualified to serve because their opposition to the death penalty would render them unable to keep their oath. Such credibility determinations are more appropriately resolved under the watchful eye of the trial judge than by an appellate court staring at a cold record, which is precisely why they are accorded a presumption of correctness under § 2254(d). Mann has not overcome this presumption; therefore, his claim must fail.

*E. Prosecutorial Definition of "Deliberate."*

31

Mann argued that the prosecutor misled a juror during voir dire that the term "deliberate" (the requisite mental state required under the first special issue of the Texas capital sentencing statute) was synonymous with the term "intentional" (the requisite mental state required for capital murder). He maintains that the prosecutor's statements violate the rule of Lane v. State, 743 S.W.2d 617 (Tex. Crim. App. 1987). The state trial court, in considering Mann's second habeas petition, concluded that this claim was barred for three reasons: (1) failure of Mann's counsel to contemporaneously object; (2) failure of Mann's counsel to attempt to correct the prosecutor's alleged misstatement; and (3) on the merits, the statements did not mislead the juror. The Texas Court of Criminal Appeals agreed, stating that "the findings and conclusions entered by the trial court are supported by the record." The district court also concluded that the Texas contemporaneous objection rule procedurally bars Mann from raising this claim. Mann argues that he is not procedurally barred because his pretrial motion adequately apprised the trial court of the gravamen of his objection.

We agree with the state courts and the district court that Mann has waived his claim by his failure to contemporaneously object.[10] See Perry v. State, 703 S.W.2d 668, 670 (Tex. Crim.

---

[10] We note that the contemporaneous objection rule may operate as a procedural bar even though the state court in this case also determined that Mann's claim failed on the merits. See Fierro v. Lynaugh, 879 F.2d 1276, 1281 (5th Cir. 1989), cert. denied, 494 U.S. 1060 (1990).

32

App. 1986) ("The failure of the appellant to complain or object in the trial court constitutes a procedural default under [Texas] law."); accord TEX. R. APP. P. 52(a). Mann's pretrial motion was inadequate to place the trial court on notice that Mann was objecting to the prosecutor's equation of the terms "deliberate" and "intentional." His pretrial motion made only two arguments: (1) that the Texas capital sentencing statute is unconstitutionally vague; and (2) that the statute fails to adequately define the terms "deliberately," "probability," "criminal acts of violence," and "constitute a continuing threat to society," thereby rendering counsel's assistance per se ineffective and permitting arbitrary imposition of the death penalty. The trial court denied this motion.

Mann's pretrial motion mounted a constitutional attack on the Texas sentencing statute itself; it did not alert the trial court to the issue now being raised on appeal-- namely, whether the prosecutor's comments violated the rule of Lane v. State, 743 S.W.2d 617 (Tex. Crim. App. 1987). Thus, the contemporaneous objection rule blocks consideration of his claim on appeal.

Mann next contends that the contemporaneous objection rule cannot bar our review of his claim on the merits because it is not "strictly and regularly followed." See, e.g., Ford v. Georgia, 498 U.S. 411, 423 (1991); Johnson v. Mississippi, 486 U.S. 578, 587 (1988); Wilcher v. Puckett, 978 F.2d 872, 879 (5th Cir. 1992), cert. denied, 114 S. Ct. 96 (1993). We need not decide this issue at this time. Even assuming arguendo that the

33

Texas contemporaneous objection rule is not strictly and

regularly followed, Mann's claim fares no better when analyzed on

the merits.  The prosecutor in this case did not intimate that

"intentional" and "deliberate" are synonymous.  In fact, the

prosecutor never even used the term "intentional" in his exegesis

of the term "deliberate."  The complained of prosecutorial

statement is as follows:

> Now, the judge isn't going to tell you what the word
> "deliberately" means.  It doesn't have any special meaning
> with regard to this question.  It means the same thing when
> you or I use it in daily language.
> You've probably heard one of your little boys say to
> the other one, "Well, you did that deliberately."  Well, it
> means the same thing.  You did it on purpose, you did it--
> it wasn't an accident.

This statement conveyed to the juror that "deliberate"

requires something more than a voluntary physical act, something

akin to conscious purpose.  See Fearance v. State, 620 S.W.2d

577, 584 (Tex. Crim. App.) (en banc) (holding that the term

"deliberately" as used in capital sentencing statute is "the

thought process which embraces more than a will to engage in

conduct and activates the intentional conduct."), cert. denied,

454 U.S. 899 (1981).  Indeed, the prosecutor's comment in this

case echoes our conclusion in Milton v. Procunier, 744 F.2d 1091,

1096 (5th Cir. 1984), cert. denied, 471 U.S. 1030 (1985), that

the jurors, in the context of a specific case, could not

reasonably assign different meanings to the word "deliberate."

As such, the prosecutor's comments conveyed a correct

34

interpretation of Texas law and Mann's contention is therefore without merit.

*F.  Ineffective Assistance of Counsel.*

Mann contends that the failure of his trial counsel to develop and offer the "double-edged" mitigating evidence of low intelligence and an abusive childhood rendered his counsel ineffective in violation of the Sixth Amendment.  We disagree.

The standard for assessing the effectiveness of counsel was announced in Strickland v. Washington, 466 U.S. 668 (1984). Strickland requires the defendant to prove two things:  (1) counsel's performance was deficient under an objective standard of reasonableness, id. at 687-88, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

When assessing whether an attorney's performance was deficient, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; Andrews v. Collins, 21 F.3d 612, 621 (5th Cir. 1994).  To demonstrate prejudice, the defendant must prove that there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant the death penalty."  Strickland, 466 U.S. at 695; Andrews, 21 F.3d at 622.

35

In this case, Mann's trial counsel admitted in an affidavit that he made a strategic decision not to introduce evidence of his low intelligence or abusive childhood because such evidence had a "double-edged" nature which may have harmed Mann's case. Such strategic decisions are "granted a heavy measure of deference in a subsequent habeas corpus attack." Wilkerson v. Collins, 950 F.2d 1054 (5th Cir. 1992) (citing Strickland, 466 U.S. at 690-91), cert. denied, 113 S. Ct. 3035 (1993). Under an objective standard of reasonableness, such a sound tactical decision does not constitute deficient performance. See Sawyers v. Collins, 986 F.2d 1493, 1505-06 (5th Cir.), cert. denied, 113 S. Ct. 2405 (1993). Mann has not overcome the strong presumption that this strategic decision was unreasonable under the circumstances; thus, he has not satisfied the deficiency prong of Strickland.

Even assuming, *arguendo*, that Mann's counsel was deficient, we find that Mann has failed to show the existence of evidence of sufficient quality and force which, if introduced, would have more likely than not persuaded the jury that the death penalty was unwarranted.[11] Callins v. Collins, 998 F.2d 269, 279 (5th Cir. 1993), cert. denied, 114 S. Ct. 1127 (1994); Wilkerson v. Collins, 950 F.2d at 1065. Thus, Mann has also failed to satisfy

---

[11] We note that the forcefulness of Mann's evidence of low intelligence is relatively weak. His I.Q. is estimated to be approximately 80, a figure which falls on the low end of the spectrum of average intelligence. As to Mann's evidence of an abusive childhood, we note that it emanates only from potentially biased family members.

36

the prejudice prong of <u>Strickland</u>.  When either prong of <u>Strickland</u> is not proven, the petitioner is not entitled to relief.  <u>Strickland</u>, 466 U.S. at 687.

G.  <u>*Caldwell v. Mississippi*</u> *Claim.*

Near the end of his closing argument of the punishment phase, the prosecutor in Mann's case told the jury:

> When is Fletcher Mann going to stop hurting women, young women and old women?  When is he going to stop raping them, robbing them, hurting people?  When is he going to stop hurting jailers?  Huh?  When is he going to stop hurting inmates, have you thought about that?  I'll tell you:  when he is executed. And not before.  And I tell you, the only shame in our system is that he's not going to be executed  tonight after you answer the three questions, because that's  what he deserves.  But we know better than that, don't we?  But he deserves to be executed tonight.

Mann contends that this argument violated the rule of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985), because it diminished the jury's sense of responsibility for its sentencing determination.  Specifically, Mann contends that the phrase, "But we know better than that, don't we?" suggested to the jury that their sentence would be subject to appellate review, thereby relieving them of fears that they would provide the "last word" on Mann's sentence and making it more likely that they would impose the death penalty.

In <u>Caldwell</u>, the Supreme Court held that the following statement by the prosecution violated the Eighth Amendment because it undermined "reliable exercise of jury discretion":

> Now, [the defense] would have you believe that you're going to kill this man and they know-- they know that your

37

decision is not the final decision.  My God, how unfair can they be?  Your job is reviewable.  They know it.

Id. at 325, 329.

While we do not endorse the prosecutor's arguments in this case as a model of propriety, we do not believe they rise to the level of a Caldwell violation.  The statement, "But we know better than that, don't we?" is ambiguous at best.  A juror hearing such a remark was not likely left with the impression that her sentencing decision was not one of life and death.  By contrast, there was no mistaking the import of the prosecutor's remarks in Caldwell.  Thus, we conclude that the prosecutor's comments did not "affect the fundamental fairness of the sentencing proceeding [so] as to violate the Eighth Amendment."  Id. at 340.

G.  Failure to Hold an Evidentiary Hearing.

Mann's final contention is that the district court erred in not holding an evidentiary hearing on his habeas petition.  Specifically, Mann contends that a hearing was necessary to adequately consider his newly discovered mitigating evidence of low intelligence and an abusive childhood.[12]  The Supreme Court

---

[12] Mann also contends that the district court abused its discretion in failing to hold an evidentiary hearing to make a factual determination of which party "initiated" the conversation that led to his confession.  In light of our determination that Mann's claim of a Sixth Amendment violation is without merit, the question of whether an evidentiary hearing was required is moot.  Even assuming the issue of initiation is not moot, Mann has not offered any evidence of "cause" for failing to develop these facts in the state court as required by Keeney v. Tamayo-Reyes, 112 S. Ct. 1717 (1992).

has held that a habeas petitioner is entitled to an evidentiary hearing in federal court regarding a claim which was not developed in the state courts only upon a showing of cause and prejudice.  Keeney v. Tamayo-Reyes, 112 S. Ct. 1715 (1992). Under this standard, the habeas petitioner bears the burden of establishing both cause for his failure to develop the facts in state court, as well as actual prejudice.  Id. at 1719.  This stringent standard is designed to further the interests of comity and judicial economy.  Id.  An exception from the cause and prejudice standard may be made only if the petitioner can show that a fundamental miscarriage of justice would result from the failure to hold a federal evidentiary hearing.  Id. at 1721.

Mann's entire argument on this issue consists of generalized assertions of unfairness[13] and citation to one case, Wilson v. Butler, 813 F.2d 664 (5th Cir. 1987), cert. denied, 484 U.S. 1079 (1988).  Wilson, however, is distinguishable because it involved

---

[13] Mann's brief states, "[Mann] has never received a hearing on his habeas petition, whether in state court or in the federal court.  Moreover, the District Court gave no reason why it did not provide a hearing, and declined to provide a reason even after Mann specifically asked. . . . Mann's Reinstated Petition included four fact affidavits and two expert reports which present mitigating evidence, much of it regarding Mann's mental impairment.  That evidence needs to be considered at a hearing." We respond to these generalized fairness arguments by noting that the holding of an evidentiary hearing is the exception, not the rule, for a typical habeas corpus petition.  In 1988, for example, only 1.11 percent of all habeas petitions obtained a full evidentiary hearing.  Charles D. Weisselberg, *Evidentiary Hearings in Federal Habeas Corpus Cases*, 1990 B.Y.U. L. REV. 131, 167 (1990); see also ANNUAL REPORT OF THE DIRECTOR OF THE ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS AI-78 (1993) (indicating that of 1,405 habeas petitions which were terminated between Sept. 30, 1992 and Sept. 30, 1993, 1,397 were terminated without any hearing).

39

a claim of ineffective assistance of counsel in violation of the Sixth Amendment, and we merely held that ineffective assistance would be sufficient cause to warrant an evidentiary hearing provided the petitioner has also established prejudice.  Id. at 671-73.  In this case, by contrast, Mann does not allege that ineffective assistance of counsel caused his failure to develop the mitigating evidence in state court.[14]  In fact, Mann proffers no reason whatsoever for his failure to develop this evidence. Furthermore, we note that Mann has not attempted to establish prejudice; he offers no explanation as to how an evidentiary hearing would have altered the outcome of his petition.  As Mann has failed to establish either cause or prejudice as required by Tamayo-Reyes, we conclude that the district court did not err in failing to hold an evidentiary hearing.

## V.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[14] In fact, as noted earlier, Mann's trial counsel submitted an affidavit stating that he made a tactical decision not to develop or present this mitigating evidence-- a tactical decision which we have determined does not constitute ineffective assistance of counsel.